**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14-20022-01-JAR** |
| | ) | |
| **JEMEL KNOX,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**MOTION IN LIMINE**

The United States of America, by and through Terra D. Morehead, Assistant United States Attorney for said District, and hereby responds to the defendant's Motion in Limine (Doc. #40), which was filed on August 20, 2015.   It should be noted that defense counsel has made sweeping statements throughout his motion that the Government intends to introduce certain evidence without even giving Government counsel the courtesy of making inquiry if in fact certain evidence would be introduced.   In fact, much of what the defendant suggests will be introduced, will not be introduced.   While the Government provided an ***"open file"*** of what the Government possesses as a result of this investigation that is simply not to presume that all of this information would be introduced.   In response to the defendant's motion, the Government responds as follows:

### I.   *Factual background*

Jemel Knox became the subject of several felony cases in Johnson County District Court. Knox was originally charged on November 14, 2013, in Johnson County, case number 13CR2619, with Felony Fleeing and Eluding and the case was assigned to Judge Thomas Kelly Ryan. During a court hearing on January 7, 2014, Judge Ryan ordered Knox to submit to a urinalysis and he told Knox to come back to the courtroom once the results were finished.   Shortly after the test, Knox

1

was brought back into the courtroom and the results showed Knox had cocaine and marijuana in his system.   Judge Ryan revoked Knox's bond, placed him in custody, with a new bond directing that the defendant be placed on house arrest with GPS monitoring and he was given a new court date of January 16, 2014.   Knox then ran from courtroom and out of the courthouse, knocking an elderly man to the ground.   Several deputies gave chase and he was arrested a short distance from the courthouse and placed into custody.   On January 8, 2014, Knox posted his new bond.

On January 16, 2014, officers were at the scheduled court hearing to take Knox into custody for a pick up order for Aggravated Intimidation of a Witness in a Wyandotte County, Kansas homicide trial; however, Knox failed to appear in court and it was determined that at the same time he was supposed to be appearing in court, he had cut his GPS monitor off at 907 N. Iowa, Olathe, Kansas, the address of Lindsey Kurtz.   A warrant was issued for Knox's arrest for failure to appear.

Johnson County Sheriff's Detective Kevin Finley[1] was assigned to locate and arrest Knox and he proceeded to Kurtz's residence where it was determined Knox had left on foot.   Detective Finley spoke to Lindsey Kurtz, who indicated her Cadillac was missing and she initially thought her sister had the vehicle, but it was determined her sister did not have the vehicle.   Lindsey Kurtz provided a telephone number of (660)528-0074, for Knox.   While Detective Finley was at Lindsey's residence, Knox called the Olathe Police Department several times from the number provided by Lindsey and wanted to know why officers were looking for him.   On January 20, 2014, Knox was charged in Johnson County District Court, case number 14CR0151, with Aggravated Escape from Custody, with this case also being assigned to Judge Ryan and a second

---

[1] Detective Finley has worked for the Johnson County Sheriff's Department for more than 26 years and has been assigned to the F.B.I. Violent Crimes Task Force for the past five years.

warrant was issued for Knox's arrest.

On January 22, 2014, Detective Finley spoke to Knox's previous girlfriend, Cynthia McBee, who indicated the two had recently broken up after he had become violent with her.   Ms. McBee stated that Knox had recently threatened her with a gun if she did not "take the rap" for a gun case out of Clay County.[2]   Ms. McBee's neighbor was present during the incident.[3]   Ms. McBee further stated about that same time, Knox had gone to her stepfather's work in North Kansas City, in possession of a handgun and threatened the stepfather.   Ms. McBee referenced that she had gotten a Protection Order against Knox, which Detective Finley had become aware of on January 17, 2014.   She provided information that Knox "always carries a pistol in his pants and has numerous weapons to include an AR15 assault type rifle[4] and a Desert Eagle pistol." Ms. McBee also provided the names of several known friends of Knox, to include Alecia Young, and was able to confirm several of his associates by looking at Facebook posts that Knox had generated on his active Facebook account.   Alecia Young identified this account to belong to Jemel Knox.

The F.B.I. Task Force had been monitoring this Facebook account, which was displaying frequent posts, many of which displayed photographs showing Knox and other individuals, to

[2] On September 11, 2013, Knox and Ms. McBee had been stopped in Clay County Missouri in a vehicle, which contained a firearm and narcotics.   Knox had already been charged in connection with this incident, which Detective Finley was already aware about.

[3] On January 22, 2014, Detective Finley was able to obtain a Kansas City, Missouri Police Department report dated January 12, 2014, which corroborated Ms. McBee's information.   In his affidavit, Detective Finley had indicated to Judge Ryan that the threat had occurred in December; however, it in fact had occurred on January 12, 2014, as referenced in the police report.   Knox claims that "the affidavit makes no suggestion that Mr. Knox is suspected by law enforcement to be in possession of a firearm" (Doc. 23, at 3); however, this is clearly not the case.   Law enforcement had concerns from Ms. McBee's information that Knox was in possession of firearms, which is why Detective Finley sought permission from Judge Ryan to search for firearms.

[4] Interestingly, the firearm seized at the time of Knox's arrest was a .223 caliber Century Arms Inc. Georgia VT rifle, Model C15 Sporter, which matched the description of the firearm provided by Ms. McBee.

include his girlfriend, Lindsey Kurtz.   One particular post which was generated was dated January 31, 2014, which said, "I gotta say I had a good day Bc I didn't have to use my AR I gotta to say it been a blessed day thank u lol."   Based upon the reference to "AR", along with the information from Ms. McBee that Knox had an "AR15 assault type rifle" they believed the reference to "AR" was a specific reference to this type/style (AR-15) of firearm.

On January 23, 2014, law enforcement received information that Knox was traveling in Lindsey Kurtz's Cadillac to pick her up at the Outhouse in Douglas County, Kansas.   When law enforcement spotted the Cadillac, the driver failed to stop and was able to elude officers.   On January 28, 2014, officers made contact with Lindsey Kurtz, who had her Cadillac back in her possession, refused to provide the name of the driver of the Cadillac from the Douglas County pursuit incident on January 23, 2014.   Kurtz denied having any contact with Knox since he had left her apartment on January 16, 2014.

On January 28, 2014, Detective Finley received additional information that Knox had obtained a new cell phone number (660)525-3002 and it was confirmed that Knox's prior phone number was no longer in service.   As a result, of this information, F.B.I. Special Agent John Hauger applied for a federal cell phone tracking warrant for Knox's new cell phone, because there was a belief he may have fled Kansas to avoid prosecution on his state charges.   On January 29, 2014, U.S. Magistrate Judge James P. O'Hara signed the cell phone authorization for a 30-day period of time.   *See* Case Number 14-MJ-08022-DJW.   It was initially determined Knox's phone was not turned on; however, on February 1, 2014, at 3:00 p.m. the records showed it was turned on. Officers were able to determine this phone had called numbers associated with Lindsey Kurtz and Alecia Young, which the investigators were already familiar with.   Knox's previously referenced phone had also had contact with the same numbers belonging to Kurtz and Young in the past.

4

On February 3, 3014, the phone was tracked to the area of 431 Freeman, Kansas City, Kansas, an apartment which investigators confirmed with management at the apartment complex, to be rented by Alecia Young.   On February 6, 2014, phone pings again indicated Knox's phone was located within 6 meters of 431 Freeman.   Officers were able to observe Kurtz's white Cadillac in the parking lot of the apartment complex.   Officers observed a black male, with a red hoodie exit 431 Freeman and go out to start the Cadillac.   A white female was observed driving away in the vehicle.   (It should be noted that Lindsey Kurtz is a white female.)   As of 1:07 p.m. on February 6, 2014, the phone pings indicated Knox's cell phone was again located at 431 Freeman.   At approximately 1:31 p.m., Detective Finley applied for and received a search warrant from Judge Ryan.   The search warrant allowed for the search and seizure of Jemel Knox and firearms.   In the affidavit, Detective Finley referenced that Knox was a convicted felon and would be barred from the possession of firearms.   While Knox was wanted out of Johnson County, Kansas, for failure to appear on a felony eluding charge and for aggravated escape from custody, there was probable cause to believe that he might also be committing the crime of felon in possession of firearms.

At approximately 2:10 p.m., officers went to the residence, knocking and announcing police presence. A short time later the door was answered by Alecia Young.   Young and several children were removed from the residence.   It was determined that Knox was upstairs in the residence.   Police presence was repeated several times and multiple commands were given to Knox to come downstairs and surrender to officers to no avail.   A robot was used to locate Knox hiding underneath the bed in the master bedroom.   When confronted by the robot and when given additional verbal commands, Knox came halfway down the stairs and was yelling at officers to back up and to give him his glasses.   Knox had the robot in his hand and threw it into the living

5

room.   Knox continued to yell at officers and took a step back up the stairs.   Knox was forcibly taken into custody without further incident.

Following Knox's arrest, officers searched the location for any firearms.   Officers with the task force observed a grey/green suitcase that was on the floor next to the bed Knox had been hiding under.   Upon inspecting the contents of the suitcase there were numerous items of clothing and a tennis shoe[5]  that were removed, at which time a .223 caliber Century Arms Inc. Georgia VT rifle, Model C15 Sporter, serial number CM00280, was also located in the suitcase. The firearm had a round in the chamber and a large capacity magazine containing 37 additional rounds was also located in the suitcase.

Law enforcement interviewed Young who said that Knox did not live with her and that he arrived at her house about 8:30 p.m. the previous evening.   A couple of hours later "Lindsey" came to the residence in a white Cadillac with Knox's suitcase and food from Taco Bell.   Young indicated Knox had brought the suitcase into the living room area and later Knox asked Young to move the suitcase out of the way, so she took the suitcase upstairs to the master bedroom. Lindsey stayed the night sleeping in the living room with Knox, but she had left in the Cadillac the next morning, prior to officers' arrival.   Young described Knox's suitcase in a manner that sounded similar to the suitcase that had been located in the master bedroom.   Young was shown the suitcase that was located near the bed Knox had been hiding under and she identified it as Knox's suitcase.   Young said the clothing in the suitcase belonged to Knox.   Young was shown the

_____

[5] The miscellaneous clothing items included several unique and distinctive items of clothing.   Clothing items of particular importance were:   a red pair of Cargo-style shorts; a red sleeveless pullover V-neck sweater with white striping around the neck and waist; a grey t-shirt with a caricature of a slot machine with the words "Cashed Out displayed; and, a pullover shirt with the words "SMLS MAFI" with trim of a string of green marijuana leaves.   The tennis shoe was a blue and white Jordan Nike.

firearm that was in the suitcase and she indicated the firearm was not hers.   Also located in the suitcase was a toothbrush.   Male DNA consistent with Knox was found on the firearm.   DNA on the toothbrush matched that of Knox with a statistical frequency of 1 in 7.672 quintillion.   There was DNA located on the firearm and ammunition and Knox was not excluded as a source of the DNA.

A simple review of Knox's Facebook shows that it is still open on the public domain.   In addition, it shows that the last postings occurred just prior to Knox's arrest on February 6, 2014. In the weeks leading up to Knox's arrest, there were regular and frequent posts, many of which are irrelevant and contain extraneous content; however, one thing that was a common theme in the postings included photographs of Knox and his associates, which occurred both before and after the January 31st "AR" post.   Interestingly, in numerous photographs dating back to January 23, 2015, Knox is shown wearing the previously referenced unique and distinctive clothing items and the same tennis shoe.   The last post that shows a photograph of Knox wearing the items was on February 6, 2014, at 4:07 a.m. – some 10 hours before his arrest.

### II.   Arguments and Authority

### A.   Information provided by Cynthia McBee

The defendant suggests that the information provided by Cynthia McBee would be hearsay because she has not been "endorsed" as a witness.   While an official Government witness list will be filed next week, the Government would offer that it is fully expected that Ms. McBee will be a witness for the Government.   The Government is well aware of the rules of evidence, including the inability to have an officer to testify about an out-of-court statement made by another individual, and is equally mindful of the necessity for any evidence to be relevant to the charge against the defendant.   This would certainly include her familiarity with his Facebook account

and the contents thereto, the identification of Knox in the various relevant photographs depicting Knox wearing the same clothing items as those located in the suitcase, her knowledge that he always had a firearm, and her knowledge that he had an AR-15 assault type rifle.

It would be the Government's position that any information Ms. McBee had about Knox possessing firearms other than the AR-15 style rifle or the details about him threatening her or her family would be irrelevant, unless the defendant opts to call into question the veracity of Ms. McBee's testimony on the information that would clearly be relevant and probative. It should be noted that one area the defendant attacked the search warrant on was the veracity of Ms. McBee; however, should the Government believe that the defendant has in any way opened the door to Knox's possession of other firearms or the acts of violence or threats of violence by Knox, the Government will certainly ask for leave of the Court to make appropriate inquiry before doing so.

### B.   Facebook posts

The defendant suggests that the Government intends to introduce a number of Facebook posts to include:

- o  Facebook posts that contain a picture of Mr. Knox with text, " NA fuck u, The police, the bitch that told on me!!!!!, The judge and the prosecutor, u pay me fuck u pay me fuck

- o  Facebook posts that contain a picture of Mr. Knox with unknown female

- o  Facebook posts that contain: the name of Jemel Knox, with text " I gotta say I had a good day, Bc I didn't have to use my AR I gotta to say it been a blessed day thank u lol"

- o  Facebook photograph of Jemel Knox and three other unknown males

- o  Facebook photographs of Jemel Knox with his hand pointed at his head in the form of a

gun.[6]

The defendant suggests that these posts/photographs are irrelevant.   In fact, the Government does not intend to introduce any of the noted posts/photographs save the"AR" comment, which is clearly relevant to the charge herein.   The Government has already alerted the defendant that it intends to offer many of the other photographs that are on Knox's Facebook that are relevant because they depict Knox wearing clothing items that were in the suitcase along with the firearm and toothbrush, which contained Knox's DNA.   These "clothing" verification photographs were posted between December 20, 2013, up to the date of the defendant's arrest; the AR post was made within one week of the defendant's arrest.

The defendant has cited to two cases that dealt with Facebook evidence; however, those two cases are factually distinguishable and certainly do not stand for the premise that Facebook evidence cannot be introduced.   In *United States v. Vayner*, 769 F.3d 125 (2nd Cir. 2014), the Government sought to introduce a web profile page; however, the court found there was insufficient authentication of it and found it problematic when the Government then tried to attribute statements on the page as being that of the defendant.   The Government's evidence herein would clearly demonstrate that the defendant made the posts on his Facebook:  first, because he references his "AR" and then is found in possession of that type of firearm a week later; second, because an acquaintance can identify that this was the defendant's Facebook; third, because of the plethora of photographs, some "selfies", purported to be posted by "Jemel Knox"; fourth, because the photographs show Knox wearing the same clothing that he is found to be in possession of, along with the firearm; fifth, because the postings on the Facebook stop after Knox

---

[6]The defendant suggests that this is a photograph of Jemel Knox with his hand pointed at his hand in the form of a gun.   This is not completely accurate, as Knox is actually extending his middle finger to the camera, as a demonstration of "flipping off" the recipient.

was arrested; and, finally, because Knox referenced in a number of jail calls that he his Facebook account was password protected and that he was interested in giving that password to someone so that they could remove his photographs, which was obviously not done.

The other case relied upon by the defendant is *United States v. Winters*, 530 Fed.Appx. 390 (5th Cir. 2013), which is likewise distinguishable.   In *Winters*, the Government relied upon an officer's testimony about photos on the defendant's website depicting firearms stacked on hundreds of thousands of dollars, and a picture of wrapped packages that resembled kilograms of cocaine.   The officer could not recognize or identify any of the objects in the photos or show that the defendant or any other members of the conspiracy were specifically tied to or possessed the objects in the photographs.   Clearly, there was a lack of authentication or relevancy to these photographs.   Interestingly, on Jemel Knox's Facebook there are likewise random photographs of other firearms and photographs of drugs – certainly were the Government intent on offering such items of evidence, then there would be a similar factual issue with that type of evidence.   Quite to the contrary, Knox's Facebook is able to be authenticated – in a way it is self-authenticating given the photographs which are displayed of the clothing items found in Knox's possession.

The Government will be able to present evidence that authenticates the Jemel Knox Facebook as belonging to the defendant.   The photographs are admissible because they are relevant to the identity of Knox as possessing the firearm in question.   The AR comment is admissible under F.R.E. 801(d)(2)(A) because it is being offered as a statement made by Knox against his interest.

The Facebook evidence would also arguably be admissible under F.R.E. 807 because it possesses circumstantial guarantees of trustworthiness based upon the arguments previously made.   The AR comment is evidence of a material fact – that Jemel Knox possessed the .223

caliber Century Arms Inc. Georgia VT rifle on February 6, 2014, and this comment is more probative on this issue than any other evidence than could be obtained through reasonable efforts because this is the only "statement" that the Government can link directly to this defendant.   The defendant seems to suggest that the Government can prove that the defendant made this statement; however, given the totality of the evidence, including all of the information contained on the Facebook, it is clear that Knox made this statement.   There is certainly no evidence that anyone else made this statement.   The admission of this evidence best serves the purposes of the rules and the interests of justice.

The defendant's motion attempts to excise out anything and everything that might be somehow damaging to the defendant, by first asserting certain information to be irrelevant under Fed.R.Evid. 401 and then falling back on a Fed.R.Evid. 403 analysis that even if the evidence is relevant the probative value would be substantially outweighed by the prejudicial effect.   The Government would also seek to clarify for the Court at the limine hearing the extent and scope of the evidence pertaining to the Facebook.

### C.   *Knox outstanding warrants*

The Government would obviously intend to present background information about how and why law enforcement became involved in this investigation and how and why they proceeded to search for Knox, because he had outstanding warrants, and that they were authorized to search for a firearm.   The Government would not go into the details about the underlying warrants or investigations into Knox's activity; however, the background information is necessary so as to avoid confusion and guesswork by the jury.

In *United States v. Freeman*, 816 F.2d 558 (10th Cir. 1987), the court held:

> Under Fed.R.Evid.Rule 801(c), 28 U.S.C.A., hearsay is a statement, other

11

than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. However, the "hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements." *Dutton v. Evans,* 400 U.S. 74, 88, 91 S. Ct. 210, 219, 27 L. Ed. 2d 213 (1970). Furthermore, out of court statements are not hearsay when offered for the limited purpose of explaining why a Government investigation was undertaken. In *United States v. Love,* 767 F.2d 1052, 1063-64 (4th Cir. 1985), *cert. denied,* 474 U.S. 1081, 106 S. Ct. 848, 88 L. Ed. 2d 890, the court held:

> The appellants argue that DEA Agent Shumand's testimony concerning information he received from a fellow DEA agent in Florida about proposed landing sites in South Carolina is inadmissible hearsay. We find this argument unpersuasive.

> Fed.R.Evid. 801(c) defines an out of court statement as hearsay if it is "offered in evidence to prove the truth of the matter asserted." However, an out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken. *United States v. Scott,* 678 F.2d 606, 612 (5th Cir.), *cert. denied,* 459 U.S. 972, 103 S. Ct. 304, 74 L. Ed. 2d 285 (1982); *see also United States v. Hunt,* 749 F.2d 1078, 1084 (4th Cir. 1984), (citations omitted). In this case, Shumand's testimony was offered not for its truth but only to explain why the officers and agents made the preparations that they did in anticipation of the appellants' arrest. As such, it was not inadmissible hearsay. *See United States v. Mancillas,* 580 F.2d 1301 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S. Ct. 361, 58 L. Ed. [2d] 351 (1978) ("Whether or not the . . . statement was true, the fact that it was made would surely explain the flurry of investigative activity in three states the jury was soon to hear about. For this purpose, outlining the background of the investigation with the evidence not being offered to prove its truth, it could be said not to be nonadmissible as hearsay." (citations omitted)).

Agent McNerman's testimony relative to discussions with the Kansas City Police Department and the confidential informant was not offered to prove the truth of the matter asserted; rather, it was admitted to explain preparations and steps in the Government's investigation of Freeman.

Of course, out-of-court statements by informants offered to explain the background of an investigation, like all evidence, must be evaluated under the criteria in Fed.R.Evid.Rules 401 and 403 for relevance and to prevent confusion or prejudice on the part of the jury. *See, United States v. Mancillas,* 580 F.2d 1301, 1309-10 (7th Cir. 1978).

*Freeman*, 816 F.2d at 563; *see also United States v. Farley*, 992 F.2d 1122 (10th Cir. 1993) (out-of-court statements of child sexual abuse victim not hearsay if admitted to show why mother began investigation).  *See also United States v. Graham*, 314 Fed.Appx. 114, 120, 2008 WL 5062269 (10th Cir. (Kan.) 2008).

The investigation background information is relevant and admissible under the case law as noted.   This evidence is highly relevant and probative and any prejudicial impact is outweighed by the necessity to give the jury a purpose behind the law enforcement actions.   In addition, the credibility of the law enforcement officers who engaged in this investigation will be important for the jury to assess.   The credibility of the agents and law enforcement officers rises and falls on their ability to demonstrate that there is a basis for the actions that they took during the investigation.

Without much explanation, the jury would be presented with a scenario that law enforcement showed up at residence with a search warrant and without any cause, authority or right.   In the current atmosphere fueled mostly by media tending to cast law enforcement in a negative light, this would give the jury an opportunity to engage potentially in an act amounting to suppression of evidence based upon beliefs that law enforcement may have acted improperly.

### D.   Recorded Jail Calls

The defendant suggests that the Government will seek to introduce 50 recorded phone calls – such is not the case.   The Government would only seek to introduce statements made by Knox, which would be admissible as statements against interest (F.R.E. 801(d)(2)(A)) or witnesses that might testify as impeachment.   Some statements made by Knox are probative to some evidence the Government would introduce concerning his Facebook and the fact that Knox was attempting

to influence certain witnesses to provide false statements, which may become relevant should the witness testify contrary to earlier statements. The Government would certainly not seek any "hearsay within hearsay" statements. The defendant suggests that the Court should require the Government to submit those calls or portions of those calls intended to be used – because the Government cannot predict what influence the defendant's statements had on potential witnesses, this is simply not possible.

In addition, the defendant made a "demand" of any statements made by the defendant while in custody, thus the Government has produced all CCA recordings of calls made by the defendant. A full review of this voluminous amount of information is still underway by the Government, thus there is simply no way to isolate what might be relevant.

### E.   Testimony that Knox was a "fugitive" or "violent fugitive"

As previously noted, it is highly relevant that Knox had outstanding warrants and was a fugitive. It certainly explains why law enforcement approached the warrant for Knox as they did, i.e., with a force of armed officers, and with the use of a robot. The Government would limit the extend of the offer of this evidence, but it is relevant under the facts of this case to explain why law enforcement acted as they did. The Government would not necessarily intend to offer that Knox was a known "violent" fugitive, but depending on questions raised during cross-examination or should the credibility of law enforcement be challenged about why they acted as they did, then such information may become relevant.

## CONCLUSION

The Government requests that the Court rule accordingly. Some of the defendant's challenges are premature on many levels – at trial the defendant can make timely objections to certain evidence and the Court can rule accordingly. At trial, this Court would be in a position to

perform its gatekeeping function of determining whether the offered evidence is relevant and should there be a prejudice argument then the Court can determine whether the probative value outweighs the prejudicial impact.   Based upon the above, the Government requests the Court to rule accordingly.

Respectfully submitted,

BARRY R. GRISSOM
United States Attorney


_s/ Terra D. Morehead_
Terra D. Morehead, #12759
Assistant U.S. Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730
Terra.Morehead@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of August, 2015, I electronically filed the foregoing response with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.


_s/ Terra D. Morehead_
Terra D. Morehead
Assistant United States Attorney

15