```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,      Docket No. 14-20022-01-JAR

 4        Plaintiff,                Kansas City, Kansas
                                    Date:  11/24/2014
 5   v.

 6   JEMEL T. KNOX,

 7        Defendant.
     . . . . . . . . . . . . . . . . . . . .
 8

 9                         TRANSCRIPT OF
                 MOTION TO SUPPRESS EVIDENCE (#23)
10             BEFORE THE HONORABLE JULIE A. ROBINSON
                    UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12   For the Plaintiff:    Ms. Terra D. Morehead
                           Asst. U.S. Attorney
13                         360 U.S. Courthouse
                           500 State Avenue
14                         Kansas City, Kansas 66101

15   For the Defendant:    Ms. Chekasha F. Ramsey
                           Asst. Fed. Pub. Defender
16                         201 U.S. Courthouse
                           500 State Avenue
17                         Kansas City, Kansas 66101

18   Court Reporter:       Kelli Stewart, RPR, CRR, RMR
                           Official Court Reporter
19                         259 U.S. Courthouse
                           500 State Avenue
20                         Kansas City, Kansas 66101

21

22

23

24

25
```

1                          I N D E X

2

3     Government's Witnesses:                              Page

      DETECTIVE KEVIN FINLEY
4       Direct Examination By Ms. Morehead                   5
        Cross Examination By Ms. Ramsey                     16
5       Redirect Examination By Ms. Morehead                24
        Recross Examination By Ms. Ramsey                   27
6

7

8                        E X H I B I T S

9     Government's
      Exhibits                Offered            Received
10
            1                    7                  7
11          2                    7                  7

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (1:31 p.m., hearing commenced.)

2              THE COURT:  All right.  You can be seated.

3   All right.  We're here in United States versus Jemel

4   Knox.  The case number is 14-20022.  Your appearances,

5   please.

6              MS. MOREHEAD:  May it please the Court.

7   Terra Morehead, Assistant United States Attorney,

8   appearing on behalf of the government.

9              MS. RAMSEY:  Good afternoon, Your Honor.

10  Che Ramsey on behalf of Jemel Knox, who appears here in

11  person.

12             THE COURT:  All right.  We're here on the

13  defendant's motion to suppress evidence that was seized

14  in connection with the execution of a search warrant.

15  There's this other pending motion to-- I think it's

16  called a motion to compel discovery of DNA in an

17  unlocked format.  But I think we all agree that that's

18  going to be heard on a different date.

19             MS. MOREHEAD:  I think we had all-- when I

20  say all, I'm talking about the Court and both counsel

21  had I think agreed that everyone would be available on

22  January 7th.  That, though, would only be a couple of

23  days before the trial.  And that was kind of a question

24  that I had was with that late date that her expert would

25  only be-- her expert is not available I guess at the
```

1   January-- or the December date that we had kind of
2   talked about.  It sort of made sense not to tie up the
3   trial date, so I-- I don't know.
4           THE COURT:  Well, I tend to agree no matter
5   how I rule on it, it's going to affect trial strategy by
6   both parties.  So I think we probably ought to look for
7   a later date.  Do you agree, Ms. Ramsey?
8           MS. RAMSEY:  I agree, Your Honor.
9           THE COURT:  Okay.  We'll plan on doing that
10  then.
11          MS. MOREHEAD:  So the Court is aware, Mr.
12  Knox is in custody on other charges.  He's I think not
13  due to get out until 2016 or something.  So he's in
14  custody for some time on some state charges, so he's not
15  being held solely on this case either.
16          MS. RAMSEY:  That's correct, Your Honor.
17          THE COURT:  All right.  So we're here then
18  on Mr. Knox's motion to suppress related to the search
19  warrant.  And this is set for a hearing.  Of course,
20  typically when it's-- when the motion to suppress is
21  based on the search warrant itself, it's a four corners
22  analysis.  But nonetheless, I assume that you have
23  argument to offer, if not more, Ms. Morehead.
24          MS. MOREHEAD:  Yes, Judge, I have evidence
25  to present.

1           THE COURT:  Does it relate to the good-faith

2   issue?

3           MS. MOREHEAD:  Yeah, and-- yes, and the--

4   and the search warrant and how it was obtained.

5           THE COURT:  All right.  Because obviously my

6   analysis of whether the search warrant was based on

7   probable cause is something I'm going to confine just to

8   the warrant and affidavit themselves.

9           MS. MOREHEAD:  Right.  Absolutely, Judge.

10           THE COURT:  All right.

11           MS. MOREHEAD:  I just thought it made sense

12   to give you information about what led up to that and

13   then how the search warrant itself was obtained.

14           THE COURT:  All right.  Proceed.

15           MS. MOREHEAD:  I'd call Detective Kevin

16   Finley to the stand.

17

18           DETECTIVE KEVIN FINLEY,

19   Called as a witness on behalf of the Government, having

20   been first duly sworn, testified as follows:

21                DIRECT EXAMINATION

22   BY MS. MOREHEAD:

23     Q.  Please state your full name for the record and

24   what you do for a living.

25     A.  Detective Kevin Finley.  I'm a detective for

1    Johnson County sheriff's office and assigned to a task

2    force position on the FBI's violent crimes task force in

3    Kansas City, Missouri.

4        Q.  And how long have you been employed as a law

5    enforcement officer?

6        A.  Almost 27 years.

7        Q.  And kind of walk us through your history as a law

8    enforcement officer.

9        A.  Four-and-a-half years in detention.  The rest of

10   the time has been warrant processing, fugitive

11   apprehension.

12       Q.  And how long have you held the rank of detective?

13       A.  Five years.

14       Q.  And how long have you been assigned to the FBI

15   task force?

16       A.  A little over five years.

17       Q.  Detective Finley, were you involved in an

18   investigation concerning Jemel Knox?

19       A.  Yes.

20       Q.  And were you actually the individual who was

21   involved with obtaining a search warrant that was signed

22   by a Johnson County District Court judge on February the

23   6th of 2014 involving the address of 431 Freeman?

24       A.  Yes.

25       Q.  And in connection with that search warrant, I

1    want to show you two documents.  First of all,

2    Government Exhibit 1, that's identified as search

3    warrant.  Government Exhibit No. 2, which is identified

4    as affidavit.  And ask you if you recognize these two

5    documents.

6       A.   That would be the affidavit for search warrant

7    there that I applied for.

8       Q.   And that's Government Exhibit No. 2?

9       A.   And--

10      Q.   Is that right?

11      A.   Yes.  And this is the search warrant that I had

12   Judge Ryan sign there in Johnson County.

13      Q.   And Judge Ryan is a Johnson County District Court

14   judge; is that right?

15      A.   Yes.

16           MS. MOREHEAD:  Judge, for the purposes of

17   this hearing, I would ask for admission of Government's

18   Exhibits 1 and 2.

19           THE COURT:  All right.

20           MS. RAMSEY:  No objection.

21           THE COURT:  Exhibits 1 and 2 admitted.

22      Q.   (BY MS. MOREHEAD)  Now, Detective Finley, I want

23   to direct your attention to the events leading up to the

24   search warrant on February the 6th.  You identified an

25   address, did you not, during your investigation of 431

1    Freeman in Kansas City, Kansas?

2        A.   Yes.

3        Q.   And that address in connection with the affidavit

4    indicates that it was associated with an individual

5    identified as Alecia Young.  Is that also correct?

6        A.   Yes.

7        Q.   And how had you identified Alecia Young prior to

8    this February 6th event?

9        A.   When I had contacted Cynthia McBee and

10   interviewed her, I had asked for associates of Mr. Knox.

11   And also in the phone records that-- on Mr. Knox's

12   phone, we had a phone number that came back to Alecia

13   Young.

14       Q.   And was that the conversation that you had with

15   Ms. McBee on January 22nd of 2014?

16       A.   Yes.

17       Q.   And so on February 6th, once Mr. Knox-- once a

18   phone associated with Mr. Knox was identified as

19   associating to 431 Freeman, were you at that location on

20   that date initially?

21       A.   Yes.

22       Q.   And what did you eventually do?

23       A.   We were conducting surveillance.  We had observed

24   a-- a vehicle known for Mr. Knox, a Cadillac, that

25   Lindsey Kurtz had been driving.  We observed that

9

1    vehicle getting warmed up.  And then it appeared Lindsey

2    leaving from that-- by that apartment, by that Freeman

3    address.

4        Q.  And so then what did you do?

5        A.  We conducted a surveillance for a while.  Then at

6    some point, I went back to Johnson County District

7    Attorney's Office and had a search warrant applied for.

8        Q.  Okay.  And so on February 6th, when the decision

9    was made to approach Johnson County authorities for a

10   search warrant, you indicated you actually went to the

11   Johnson County D.A.'s office?

12       A.  Yes.

13       Q.  And who was-- who was involved in the application

14   here of the search warrant?

15       A.  Vanessa Riebli was the prosecutor on that.  And

16   we walked that down to Judge Kelly Ryan to swear out the

17   warrant, search warrant.

18       Q.  And so the two documents that are before me,

19   Government Exhibit 1 and 2, which you have those same

20   copies up there, who actually prepared those documents?

21       A.  Vanessa Riebli would've typed those up.

22       Q.  And she's a prosecuting attorney?

23       A.  Yes.

24       Q.  Do you know how long she's been a prosecuting

25   attorney?

1        A.  I have no idea.

2        Q.  And what process did you and Ms. Riebli go

3    through in order to prepare this paperwork?

4        A.  I explained some of the interviews that I had

5    conducted while I was applying for the search warrant,

6    third-party residence, some of the difficulties we had

7    in cooperation with being able to talk to people, and

8    that I did not believe that they would probably answer

9    the door.  And then we needed to be able to get-- get

10   Mr. Knox out of there.  And we would not be able to

11   watch the residence for very long without standing out

12   in the neighborhood.

13       Q.  Okay.  So the way I-- just so I'm clear, you go

14   to the Johnson County D.A.'s office and you sit down and

15   talk to Ms. Riebli?

16       A.  Uh-huh.

17       Q.  About Mr. Knox?

18       A.  Yes.

19       Q.  And do you explain to her all of the stuff that

20   had occurred in this investigation prior to that time?

21       A.  Yes, what I needed to-- to get my search warrant,

22   yes.

23       Q.  Okay.  And you've had an opportunity to look over

24   the affidavit.  Were there facts and details that you

25   had explained to Ms. Riebli that she didn't put in the

1    affidavit?

2      A.   There could be.  It's not-- not every interview

3    that I conducted is on here, just the basics, to try to

4    get Mr. Knox in a time frame to be able to get him

5    before he either left or we didn't have the manpower to

6    go to the house.

7      Q.   But you would have explained everything that you

8    had done to Ms. Riebli leading up to the search warrant?

9      A.   Yes.

10     Q.   And so when you said not everything is in there,

11   is it safe for me to conclude then that Ms. Riebli

12   didn't put everything in there that you had provided to

13   her?

14     A.   Yes.

15     Q.   But the information that's contained in the 12

16   numbered paragraphs, those would've been facts that she

17   included in the affidavit to present to Judge Ryan?

18     A.   Yes.

19     Q.   And is that kind of a protocol that's followed in

20   Johnson County in connection with a search warrant, that

21   the prosecuting attorney helps-- helps prepare and draw

22   up the documentation to then provide it to the Court?

23     A.   Yes.

24     Q.   And as an attorney who practices law in the state

25   of Kansas, do you rely upon her good judgment as far as

1  what's necessary to include in the affidavit to some

2  degree in presenting what's necessary to the judge?

3      A.  Yes.

4      Q.  And in looking at sometimes the-- the wording

5  that's contained in an affidavit or in any sort of

6  document, would you agree with me sometimes things--

7  there may be a way to more artfully put something?

8      A.  Always, yes.

9      Q.  And I just want to look at Paragraph 4 just to

10  clarify a point.  There was information provided to

11  Judge Ryan concerning Ms. McBee that-- and I think it's

12  the third, fourth-- fourth sentence.  "She did advise he

13  always carried a gun and threatened her and her neighbor

14  in December.  He had also gone to her father's job in

15  Kansas City, Missouri, and threatened him and his

16  employees with a gun."  And those events as described by

17  Ms. McBee, were those collectively in December?

18      A.  Yes.

19      Q.  And so when that information was provided on this

20  affidavit, the information by Ms. McBee, this would've

21  been information that Judge Ryan had available to him?

22      A.  Yes.

23      Q.  Okay.  And specifically the information about

24  Alecia Young being an associate, was there information

25  in here that Judge Ryan was able to see that confirmed

1    the information that Ms. McBee provided to you about Ms.

2    Young?

3              MS. RAMSEY:  I'm going to object to the

4    question, Your Honor.  I think it calls for speculation

5    about what the judge--

6              MS. MOREHEAD:  No, I'm asking him if there

7    was-- if he provided--

8      Q.  (BY MS. MOREHEAD) Did you provide corroboration

9    to Judge Ryan - if I didn't make that clear - did you

10   provide corroboration to Judge Ryan about what Ms.

11   Young-- Ms. McBee told you about Ms. Young?

12     A.  That she--

13             MS. RAMSEY:  Also object--

14             THE COURT:  Wait, wait, wait.

15             MS. RAMSEY:  I'm sorry.  I'm also going to

16   object to relevance, Your Honor.  It's not relevant as

17   to the proceeding, what additional information was

18   provided to the judge outside the four corners of the--

19             MS. MOREHEAD:  No, this is--

20             THE COURT:  Wait, wait, wait.  I'm going to

21   sustain as to the form of the question.  Judge Ryan has

22   to decide this based on probable cause in the affidavit

23   itself.

24             MS. MOREHEAD:  Right.

25             THE COURT:  So my question-- I mean, it

1  sounds like your question went to did he provide Judge

2  Ryan with additional information that was extraneous to

3  the affidavit?

4           MS. MOREHEAD:  No.  No.  I'm talking about

5  within-- within the four corners of the affidavit, did

6  Detective Finley provide information to Judge Ryan to

7  corroborate the information from Ms. McBee about Ms.

8  Young.

9           THE COURT:  All right.  I think that goes to

10 your first objection, which is essentially the affidavit

11 speaks for itself.  And I've already looked at it and

12 drawn lines about what corroborates what, so I don't

13 think it's necessary you go through that.

14           MS. MOREHEAD:  That's fine.

15   Q.  (BY MS. MOREHEAD)  Once the affidavit and search

16 warrant were prepared, Detective Finley, what did you

17 and Ms. Riebli do?

18   A.  We went down to Judge Ryan's chambers, swore out

19 on the affidavit and Mr. Ryan-- or he signed the search

20 warrant.  And I went to Kansas City, Kansas, to execute

21 the search warrant.

22   Q.  And when you were meeting with Judge Ryan, did

23 he-- did you provide him any information aside from what

24 was in the affidavit?

25   A.  Only on how phone pings worked.

```
 1              MS. RAMSEY:  Objection, Your Honor.  Again--
 2              THE COURT:  I think the question was did he
 3     provide any additional information, I'll let that--
 4        A.  Just in reference to how phone pings worked.
 5        Q.  (BY MS. MOREHEAD)  Okay.  And so that had to do
 6     with Paragraphs 8 and 9 when you were-- actually 8, 9,
 7     and 10, when you were talking about phone pings?
 8        A.  Yes.
 9        Q.  And so there was some question on Judge Ryan's
10     part at least about how phone pings worked?
11        A.  How to locate phones, yes.
12        Q.  Okay.  Anything else that Judge Ryan asked you
13     about when you met with him?
14        A.  No.
15        Q.  And so in the search warrant that you applied
16     for, the affidavit asked for permission to locate the
17     body of Jemel Knox and firearms at 431 Freeman.
18        A.  Yes.
19        Q.  Is that right?
20        A.  Yes.
21        Q.  And once that search warrant was signed, based
22     upon the fact that Judge Ryan had signed this search
23     warrant, what did you believe as a law enforcement
24     officer?
25        A.  As far as?
```

1    Q.   What you could do in connection with this search

2    warrant.

3    A.   Legally enter the residence at the Freeman

4    address.

5    Q.   And do what?

6    A.   And try and attempt to locate Mr. Knox and any

7    firearms in the residence.

8    Q.   And did that happen after the search warrant was

9    signed?

10   A.   Yes.

11   Q.   Did you and other law enforcement personnel do

12   that at 431 Freeman?

13   A.   Yes.

14   Q.   And were you, in fact, acting in good faith based

15   upon the warrant that Judge Ryan had signed that you had

16   the authority to do that?

17   A.   Yes.

18        MS. MOREHEAD:   Judge, that's all I have of

19   Detective Finley.

20        THE COURT:   All right.   Ms. Ramsey.

21                  CROSS EXAMINATION

22   BY MS. RAMSEY:

23   Q.   Good afternoon, Detective.

24   A.   Good afternoon.

25   Q.   I want to call your attention to Defendant's

1    Exhibit No. 2, which is the affidavit in this case.

2                MS. MOREHEAD:  Government's exhibit.

3    Q.  (BY MS. RAMSEY) Sorry, Government's exhibit-- I'm

4    sorry, Government Exhibit No. 2, which is the affidavit

5    in this case.  Do you have that in front of you?

6    A.  Yes.

7    Q.  And I'm looking at Page 2 of 3, No. 4.

8    A.  Okay.

9    Q.  Okay.  Looking at No. 4, that is the information

10   given to you by Cynthia McBee; is that correct?

11   A.  Yes.

12   Q.  Okay.  And there's nothing contained within No. 4

13   from the information she gave you that Mr. Knox has kept

14   firearms at 431 Freeman.  Correct?

15   A.  No.

16   Q.  Okay.  And, in fact, there's no information

17   whatsoever in this affidavit that a firearm was being

18   kept at 431 Freeman.  Correct?

19   A.  No.

20   Q.  No, it's not correct, or yes, it is correct?

21   A.  It's correct that there's no information that

22   says 431 Freeman specifically.

23   Q.  There's no information that a firearm was being

24   kept at any residence?

25   A.  Only with him in possession.

1      Q.   Again, not in a residence?

2      A.   Not at that 431 Freeman.

3      Q.   There's no residence at all indicated in this

4   affidavit that a firearm was being kept at.  Correct?

5      A.   No.

6      Q.   No, it's not correct, or yes, it is correct?

7      A.   There's nothing specifically saying a specific

8   residence that a specific firearm was there.

9      Q.   Thank you.  I also want to call your attention to

10  Page 3.  And it would be Roman Numeral No. 11.  Do you

11  have that in front of you?

12     A.   Yes.

13     Q.   And in looking at Page 3 of Government's Exhibit

14  No. 2, the last statement there where it asks whether

15  you're seeking a search warrant and what it's for, would

16  you agree that it says, "We're seeking a search warrant

17  to enter 431 Freeman, Kansas City, Wyandotte County,

18  Kansas, to arrest Jemel Knox"?

19     A.   Yes.

20     Q.   It does not say that you were seeking a search

21  warrant to enter 431 Freeman to search for firearms.

22  Correct?

23     A.   Not in No. 11, just on the first page.

24     Q.   On the first page what you're talking about is

25  simply the stamp that says "firearms" there.  Correct?

1    A.  "The body of Jemel Knox, black male, 7-3 of '83

2    and firearms."

3    Q.  But in the conclusory statement for what you're

4    asking for is simply the arrest of Jemel Knox?

5    A.  In No. 11, yes.

6    Q.  And you correct me if I get these numbers wrong

7    because I was writing pretty fast, but you've been a law

8    enforcement officer with the Johnson County sheriff's

9    office for 27 years; is that correct?

10   A.  In January it will be 27 years, yes.

11   Q.  Okay.  And five years on the FBI task force and

12   as a detective; is that correct?

13   A.  Yes.

14   Q.  Okay.  And you said that part of the protocol was

15   to go to the prosecuting attorney's office and they

16   wrote the search warrants for you; is that what you're

17   saying?

18   A.  Yes.

19   Q.  However, the information was given by you.

20   Correct?

21   A.  Yes.

22   Q.  And you have to swear under oath to the truth in

23   the affidavit.  Correct?

24   A.  Yes.

25   Q.  I want to call your attention back to Roman

1    Numeral No. 4, Government Exhibit No. 2, Page 2.

2    There's a statement there by Cynthia McBee that says,

3    "She did advise he always carried a gun and had

4    threatened her and her neighbor in December."  Would you

5    agree with that statement, that it says that there?

6        A.  Yes.

7        Q.  Okay.  What it doesn't say is that he threatened

8    her and her neighbor with a gun in December.  Correct?

9        A.  Specifically, no.  It does not say that

10   specifically in that.

11       Q.  Okay.  So the information we have from Ms. McBee

12   is that he carried a gun at some time in the past?

13       A.  That he carried a gun, yes.

14       Q.  Have you applied for and have searched-- obtained

15   search warrants for drug transactions or activity in the

16   home?

17       A.  For drug transactions, no.

18       Q.  No.  Have you ever applied for a warrant to

19   seize-- basically a drug warrant for the sale of drugs?

20       A.  No.

21            MS. MOREHEAD:  Judge, I'm having trouble.

22   She's trailing off.

23            MS. RAMSEY:  Sorry.

24            MS. MOREHEAD:  But I don't know the

25   relevance of any search warrants that he's ever applied

 1    for in the past, so I would object based upon relevance.

 2              THE COURT:  I think it goes to the

 3    good-faith issue, so I'll overrule.

 4              MS. MOREHEAD:  Okay.

 5       A.  Not for drugs, no.

 6       Q.  (BY MS. RAMSEY) Okay.  Tell me what form of

 7    crimes have you applied for search warrants for?

 8       A.  For fugitives.  Specifically persons with

 9    outstanding warrants.

10       Q.  Okay.  And only persons?

11       A.  Huh?

12       Q.  I'm sorry, I cut you off.

13       A.  For persons with warrants.

14       Q.  Okay.

15       A.  Fugitives.

16       Q.  And you said that-- actually, I believe it's also

17    here in the affidavit.  There were other warrants out

18    for Mr. Knox's arrest; is that correct?

19       A.  Yes.

20       Q.  Okay.  And those other warrants you were aware

21    of?

22       A.  Yes.

23       Q.  Okay.  And you had the power to enforce those

24    other warrants.  Correct?

25       A.  To arrest on the outstanding warrants, yes.

1     Q.  Okay.  And you had done some surveillance on the

2  home; is that correct?

3     A.  Yes.

4     Q.  And you also had a search warrant that had pinged

5  a cell phone that was attached to Mr. Knox, to 431

6  Freeman.  Correct?

7     A.  Yes.

8     Q.  And so-- and that was part of the reason why you

9  wanted the affidavit and search warrant for the home of

10  431 Freeman.  Correct?

11     A.  It was a third-party residence, and it didn't

12  give me the right to go kick a door in or anything

13  without a search warrant.

14     Q.  Correct.  But upon-- you could arrest him outside

15  of the home.  Correct?

16     A.  If we saw him, yes, we would arrest him.

17     Q.  Okay.  In your past applications for affidavit

18  and search warrants for the body of a person, have you

19  included other things that you were searching for?  So

20  past practices of applying for an affidavit for a search

21  warrant of a person, a fugitive--

22     A.  Uh-huh.

23     Q.  -- have you asked for additional-- search for

24  additional crimes or criminal activity?

25     A.  No.

 1    Q.  In exhibit-- Government's Exhibit No. 2, again

 2   back to No. 4, Page 2 of that exhibit, I believe there

 3   were specific firearms that Ms. McBee alleges Mr. Knox

 4   carried; is that correct?

 5    A.  Yes.

 6    Q.  Okay.  And were those firearms specifically

 7   spelled out in the actual search warrant?  I'm looking

 8   at Government Exhibit No. 1.

 9    A.  Yes.

10    Q.  Were they listed by detail of the type of

11   firearm?

12    A.  AR-15 assault rifle and Desert Eagle.

13    Q.  And I apologize, I think I've confused you.  I

14   apologize.  I'm looking at Government Exhibit No. 1,

15   which is the search warrant in this case.

16    A.  Okay.

17    Q.  Are the firearms there?  Is there anything there

18   listing individual-- the make or model of the firearms

19   in that search warrant?

20    A.  In Paragraph No. 1, is that what you're--

21    Q.  No.

22    A.  In number-- it was listed in No. 4 what we were

23   looking for.

24    Q.  Okay.  And I'm going to start over.  I'd like to

25   call your attention to Government Exhibit No. 1.

1     A.  Oh, okay.  Sorry.

2     Q.  That's all right.

3     A.  Uh-huh.

4     Q.  And in looking at Government Exhibit No. 1, it

5  simply says a search for firearms there.  Would you

6  agree with that?

7     A.  That's correct.

8     Q.  It does not list--

9     A.  Specifics, no.

10    Q.  Okay.  But that information was laid out in the

11 affidavit; is that correct?

12    A.  That's correct.

13         MS. RAMSEY:  I have no further questions,

14 Your Honor.

15         MS. MOREHEAD:  Just a couple of follow-up,

16 Judge.

17         THE COURT:  Yes.

18                  REDIRECT EXAMINATION

19 BY MS. MOREHEAD:

20    Q.  To kind of stay with that topic first, Detective

21 Finley.  In that Paragraph No. 4 that Ms. Ramsey was

22 talking about where there were specific references to

23 weapons, does that read "to include," "firearms to

24 include"?

25    A.  An AR-15 assault rifle and Desert Eagle, yes, it

1  does.

2      Q.  Did it say those were the only two firearms that

3  Mr. Knox was known to possess?

4      A.  It does not specifically-- not restrict him to

5  those.  He could've had other weapons, but those were

6  specific ones that she knew him to have.

7      Q.  Okay.  And so another-- just staying with

8  Paragraph 4.  She was-- Ms. Ramsey was asking questions

9  about him having carried firearms in the past.  I-- I

10 see twice in that paragraph that you used a qualifier,

11 the word "always."  He always carried a gun, he always

12 carries a pistol in his pants.  Do you see that word

13 "always"?

14     A.  Let's see here.  Yes.

15     Q.  Why did you use that word "always"?

16     A.  Because she said that-- specifically that he

17 always carried a gun wherever he went.

18     Q.  Okay.  And so even though in the affidavit you

19 didn't specifically specify a gun being connected to 431

20 Freeman, did you identify that firearms would be

21 connected to Mr. Knox?

22     A.  Yes.

23     Q.  And in connection with not only the affidavit but

24 the search warrant, let's look, first of all, at

25 Government Exhibit No. 1.  Did the search warrant-- was

1   it issued for seizure of items to include the body of

2   Jemel Knox, as well as firearms?

3       A.   Yes.

4       Q.   And in the affidavit-- prior to the actual

5   affidavit, does it also ask for property to be seized in

6   connection with the crime to include the body of Jemel

7   Knox, as well as firearms?

8       A.   On Exhibit 2?

9       Q.   Yes.

10      A.   Yes.

11      Q.   On that first page.

12      A.   Uh-huh.

13      Q.   And so I think I heard Ms. Ramsey ask you if you

14  had in prior-- on prior occasions actually obtained

15  search warrants.

16      A.   Yes.

17      Q.   And you had indicated that had been limited to

18  securing warrants to seize people, much like you did

19  with Mr. Knox?

20      A.   Yes.

21      Q.   And on any prior occasion, did I understand that

22  you had not included to search for other related items,

23  like in this case to search for firearms?

24      A.   No.

25      Q.   Right?

1    A.   That's correct.

2    Q.   So this was the first time you had had a

3  situation where this had applied?

4    A.   Yes.

5    Q.   And why did you do it in this case?

6    A.   Specifically when they said that he always

7  carried firearms in prior interviews with other people

8  on this, carried firearms, we felt that being a

9  convicted felon federally, that with his protection

10 order out there, pending charges, that he would more

11 than likely have a gun and probably try to hide it or

12 conceal it if he was cornered.

13   Q.   And if someone always carries a gun, based upon

14 your training, knowledge, and 27 years of experience, do

15 you-- have you found that individuals who are known to

16 always carry a gun, that whenever you encounter them,

17 they're more likely than not going to have a gun on

18 those occasions as well?

19   A.   Yes.

20        MS. MOREHEAD:  Judge, that's all I have.

21        THE COURT:  Anything more?

22        MS. RAMSEY:  Could I have just a moment,

23 Your Honor?

24        THE COURT:  Yes.

25              RECROSS EXAMINATION

1  BY MS. RAMSEY:

2     Q.  Detective Finley, this is part of my ignorance to

3  how the process works.  So when you are swearing to this

4  affidavit in front of the judge, you've read this

5  affidavit.  Correct?

6     A.  Yes.

7     Q.  Okay.  And you read it prior to even submitting

8  it to the judge.  Correct?

9     A.  Yes.

10    Q.  And again, you're saying that your logic was that

11  if someone has a gun in the past, then that they're more

12  likely than not always going to be somewhere where

13  there's a gun; is that correct?

14    A.  Not necessarily always, but normally, yes.  If

15  they carry a firearm or they're known to carry it, then

16  they're probably going to have it around them or around

17  their person.

18    Q.  And that's your standard?

19    A.  Yes.

20          MS. RAMSEY:  Okay.  I have no further

21  questions, Your Honor.

22          MS. MOREHEAD:  Nothing based on that, Your

23  Honor.

24          THE COURT:  All right.  You can step down,

25  Detective Finley.  Anything more, Ms. Morehead?

 1              MS. MOREHEAD:  No, Judge.  Thank you.

 2              THE COURT:  Ms. Ramsey?

 3              MS. RAMSEY:  No, Your Honor, just argument.

 4              THE COURT:  All right.  I'll hear from you,

 5    Ms. Ramsey.

 6              MS. RAMSEY:  Thank you, Your Honor.  I would

 7    suggest to the Court that the additional information the

 8    government tried to provide in their response, as well

 9    as here today, is an indication to me that it is clear

10    there is no probable cause to issue the search warrant

11    for the 431 Freeman address in this case.

12              The question is to the Court's determination

13    whether or not looking at the totality of the

14    circumstances that the affidavit supports the search

15    warrant as it supports probable cause.  The answer is

16    no.

17              In the government's argument, the idea of

18    probable cause they put forth is that there must be--

19    there doesn't have to be any nexus to a particularized

20    place to be searched, nor - because having a gun and

21    being a felon is a continuous criminal activity - does

22    there ever have to be a time frame on the information

23    given.  That's clearly not the standard.  That's clearly

24    not the standard set by the Supreme Court, the Tenth

25    Circuit, or district judges locally here.

1            There must be information provided in which

2    there is particularized facts that there's ongoing

3    criminal activity in the place to be searched.  That

4    information must not be stale.  What we argue to the

5    Court is that information-- it's hard to make a

6    determination whether it was stale or not, because there

7    was no time frame given to the Court about any gun.

8            There was a complete admission that there

9    was no nexus, no information given that connects any

10   firearm to the residence.  It is not enough that Mr.

11   Knox has been known in the past through what we would

12   argue are statements that lack any veracity or

13   credibility, which have not-- which were in no way

14   verified in this affidavit, to say that.  That totally

15   ameliorates the Fourth Amendment standards.

16           What that means is, at all times and at all

17   place where anyone-- where a third party, non-verified

18   statement has been made that they carried a gun, is that

19   there's probable cause to search your home, my home,

20   anyone here.  That negates all Fourth Amendment

21   standards and is exactly the behavior the exclusionary

22   rule dictates to the Court.  That in this particular

23   case, defendant's motion should be granted.

24           In looking-- in addition, Your Honor, part

25   of the statements made by Ms. McBee, if you take the

1    totality of the circumstances, the only thing you have

2    in the four corners of this affidavit is Ms. McBee's

3    statement.  The government would argue that the

4    credibility of her statement is not critical to the

5    Court's determination.  However, when the only totality

6    of the circumstance-- when you're looking at that as the

7    standard, and the only fact that the Court has to

8    consider is that statement, it becomes critical about

9    whether or not it's been tested in any way.  All cases

10   say that where CI information has been given.

11           Normally, there is some C-- sorry, CI,

12   confidential informant's information given that's been

13   either verified previously or, at least in those cases

14   where they have upheld a third-party statement, it has

15   been verified by additional facts.  Those additional

16   facts could be further surveillance and facts,

17   additional statements by others, trash dumps, any

18   additional information.  But that's not what's in front

19   of the Court in the four corners of this affidavit.

20           If the Court finds that the affidavit was

21   devoid of any facts that would establish the probability

22   of evidence that the criminal activity would be located

23   in that desired search area, then the *Leon* good-faith

24   exception does not apply.  That is what *Leon* says.

25   Statements about just mere professionalism in seeking a

1  warrant, complying with general standards, is not enough

2  of good faith.

3          It is clear that there is no nexus here.  It

4  is devoid of total facts and no reasonable officer

5  could've-- it is-- could've objectively relied on the

6  information contained in that affidavit.  This was not a

7  mistake.  It is clear that there is-- tried to be

8  additional information given to the Court to now

9  establish this nexus.  It wasn't there.

10          For good faith to exist, there must be some

11  factual base connecting the place to be searched to the

12  suspected criminal activity.  When this is wholly

13  absent, the resulting warrants are so lacking.

14  Reasonably well-trained officers will be able to

15  recognize this deficiency.  And here again, it was so

16  lacking.

17          Again, Your Honor, the exclusionary rule

18  exactly is what's called for here.  This is the type of

19  behavior that, if allowed to continue, would totally

20  ameliorate the requirements of the Fourth Amendment,

21  which is that you have to have particularized suspicion

22  and apply for that under good faith.

23          We also would call the Court's attention to

24  what was slightly raised in my motion, Your Honor, in

25  that it is somewhat misleading in that last statement in

1    the affidavit that the only thing they're asking for is

2    for the arrest of Mr. Knox, almost stamping that front

3    on the fire-- that as to be on the firearms on the

4    front.  All that information leading up to in the

5    affidavit is in support of that.  Not that any firearms

6    would be found at the 431 Freeman address.

7          I think in-- and I understand that it is

8    another district court's opinion, but in my motion to

9    suppress, I did call the Court's attention to *United*

10   *States versus Bautista-Meza*, which was a 2014 case here

11   in front of Judge Melgren.  And in looking at that

12   opinion and the transcripts, what he found very

13   concerning is that the warrant did not establish any

14   nexus to the residence.  That there was no reason to be

15   stated that there would be any idea to attach the

16   criminal activity with that particular residence, and

17   granted defendant's motion to suppress.  And we make the

18   same argument here, Your Honor.  Thank you.

19          THE COURT:  Ms. Morehead.

20          MS. MOREHEAD:  Judges are presumed to be

21   smart and judges are presumed to have common sense.  And

22   when this was presented to Judge Ryan, if we look at the

23   four corners of the affidavit, which I know you're now

24   required and responsible for looking at, what-- what you

25   look at is, was there really any reasonable basis for

 1    Judge Ryan to give authority to Detective Finley and

 2    other law enforcement personnel to search for Jemel Knox

 3    and/or the firearms that were-- that were mentioned in

 4    the application.

 5            And what Judge Ryan saw was the information

 6    specifically as it relates to the firearm in

 7    Paragraph 4.  It wasn't like firearms were just tacked

 8    on like Ms. Ramsey wants to suggest.  There was

 9    information specifically to firearms that were related

10    to this application.  And the information in there was

11    from January 22nd.  So it was fairly recent to the

12    search warrant, which was on February 6th.  And the

13    incident that Ms. McBee had described involving the

14    threat was in December.  And what Ms. McBee indicated

15    was that he "always" had a-- had a gun.

16            So that's the information that Judge Ryan

17    had.  And so what Judge Ryan could look at just by

18    looking again at the four corners of the affidavit is,

19    well, what-- what is there to show that Ms. McBee is

20    credible?  And what you can see, clearly, is that she

21    gave information about associates of-- of his, including

22    this Alecia Young.  And lo and behold, that's precisely

23    where the cell phone records showed Mr. Knox having

24    contact with Alecia Young, as well as that ends up being

25    the address where he's located.

1          So Judge Ryan could see, just again in the

2    four corners of this affidavit, that Ms. McBee was

3    credible, at least as it related to facts that were

4    presented to him, such that it would be reasonable for

5    him to conclude that she was a reliable informant.

6    There's no requirement, as I indicated, for that to be

7    spelled out in any particular language or to, you know,

8    put it in succinct language to the judge.  The judge is

9    capable of deducing his own conclusions based upon the

10   information provided.

11          So when this search warrant was executed, he

12   had the information that Knox was known to always have a

13   gun and that he was at 431 Freeman.  That there was

14   probable cause to those facts.  So when Ms. Ramsey wants

15   to argue that you have to show a connection to the

16   residence, clearly there has to be a connection to Knox

17   to the residence.  But the gun is specifically connected

18   to Mr. Knox, who we can now associate with 431 Freeman.

19   So that's how you get the firearm associated with 431

20   Freeman.

21          Had there not been the reference to the

22   firearms or that he always had a firearm, then perhaps

23   that argument would-- would be warranted.  But there was

24   clearly information that Judge Ryan had that would

25   justify him authorizing these officers to search the--

1    the residence not only for Mr. Knox but for firearms.

2            THE COURT:  So if, for example, Ms. McBee

3    had said-- instead of saying she knew him to always

4    carry a firearm, she said she knew him to always be in

5    possession of cocaine, would that have been sufficient

6    for the search warrant to have also included authority

7    to search for cocaine?

8            MS. MOREHEAD:  I can't-- I can't say that,

9    because I think firearms are a different commodity.  And

10   that's why in my response, I articulated those-- those

11   cases that talk about firearms and individuals'

12   possessions of firearms.  Drugs are a much more I think

13   fluid commodity.  You can ingest drugs, you can get rid

14   of drugs fairly easily.  And I think the case law is

15   pretty clear on that, which is why the argument about

16   staleness as it relates to firearms, why it's different.

17   And courts have routinely found that firearms are a

18   different commodity.  Different from drugs.

19           THE COURT:  Well, by definition, drugs are

20   either consumed or they're disposed of, firearms not

21   necessarily the case.  So I recognize the difference.

22           MS. MOREHEAD:  Right.

23           THE COURT:  But let's just say that she said

24   instead of a firearm perhaps some other tool of trade.

25   Perhaps she said, you know, there would be burglar tools

1   or there would be plates to make counterfeit money or,

2   you know, something that, you know, he could take with

3   him from place to place.

4           I guess my question is-- I'm asking sort of

5   an appellate judge's type of hypothetical in a sense,

6   is:  Would this search warrant support-- would this

7   affidavit support search for other instrumentalities of

8   a crime like that?

9           MS. MOREHEAD:  I don't-- I don't think I'm

10  prepared to say that it would and for much the same

11  reason as I just articulated with drugs.  And-- and

12  that's simply because firearms are-- are different and

13  are unique.  People who possess firearms typically

14  possess them for long periods of time.  And-- and that's

15  what makes firearms kind of a unique tool I think was

16  the word you used.

17          But I don't know-- I mean, I would have to

18  really analyze when you talk about burglar tools or-- I

19  mean, or I-- I can't see myself making that argument

20  with that.  But with firearms, just because of the

21  nature of firearms and the way they're used and the

22  methodology behind them and that they're not a fluid

23  commodity, they're something that people typically

24  possess in a-- in an ongoing manner, then they're--

25  they're unique because of that.  And that I think is why

1   I cited to the cases that I did.

2          So that's the first thing that I would argue

3   on the probable cause.  The second thing, obviously,

4   Judge, which Ms. Ramsey did-- did briefly mention is the

5   good faith.  And--

6          THE COURT:  I think Ms. Ramsey's argument

7   was that the affidavit is devoid of any factual basis,

8   not necessarily with respect to-- there is mention of

9   firearms.  Ms. McBee specifically says that Mr. Knox

10  always possessed firearms, and she described a couple of

11  them.

12         But her argument is that-- that the *Leon*

13  exception doesn't apply because this affidavit is

14  entirely devoid of facts that would establish a nexus

15  between 413 Freeman and a firearm, possessed by Mr. Knox

16  or otherwise.  I mean, there's nothing in this affidavit

17  that establishes that Mr. Knox was staying there for any

18  particular period of time.

19         I mean, there-- it seems to me like there's

20  a lot of probable cause to establish that he was there,

21  the cell phone pings, they corroborated Ms.-- well, Ms.

22  McBee gave, you know, some identification of some of his

23  associates.  And it turns out that one of those

24  associates was the resident at 431 Freeman and that, in

25  fact, the cell phone pings on a cell phone that looked

1    like it might be associated with Mr. Knox came back to

2    there.  All of which sort of add up to probable cause

3    that he was there.

4            But Ms. Ramsey's argument is, where is the--

5    where is the probable cause that there was a firearm

6    there, other than Ms. McBee's uncorroborated statement

7    that he always had guns, at least in December he always

8    had guns.

9            MS. MOREHEAD:  Well, at least in January

10   when she gave the information.  That's when the

11   information was.  January 22nd when she said that, it

12   was that he always had guns.  That's what-- that's when

13   the detective talked to her.  There was an incident in

14   December where he had a gun, but the information that

15   she gave was in January, January 22nd, that he always

16   had a gun, that was the information that was provided to

17   Judge Ryan.

18           THE COURT:  All right.

19           MS. MOREHEAD:  But that doesn't-- that-- I

20   think that-- that still goes towards the probable cause.

21   That doesn't go to the good-faith argument, because

22   the-- the good-faith argument doesn't-- doesn't speak to

23   the issue of whether there is a connection to the

24   residence.  That has to go with probable cause.

25           THE COURT:  All right.  So that's my

1    question.  In terms of analyzing the applicability of

2    the *Leon* exception and the prong that Ms. Ramsey

3    specifically speaks of and that the affidavit and search

4    warrant were devoid of probable cause altogether, your

5    argument is that *Leon* only goes to-- well, your

6    argument-- what she's essentially saying I think, and

7    she can speak for herself, is that this affidavit is

8    devoid of any nexus specifically to that address.

9              MS. MOREHEAD:  Well, and that doesn't--

10             THE COURT:  Beyond Ms. McBee's statement

11   that he always carried a firearm, which presumably would

12   open up, you know, the entire globe, anywhere he

13   happened to be would be - I guess in the government's

14   view - appropriate to issue a search warrant.  You know,

15   if he happened to be in church, you could get a search

16   warrant to go into church and get him because, according

17   to her, he always had a gun with him.

18             But otherwise, this affidavit is devoid of

19   anything that would tie that location where he-- you

20   know, there was probable cause perhaps to show that he

21   was there.  But other than that, there's-- it's devoid

22   of anything to show that a gun was there on the

23   premises.

24             MS. MOREHEAD:  Well, except that he always

25   had a gun.  And he's there.  So again, we're tying the

1  gun to him and him to the premise.  Which, again, I'm

2  looking at the specific thing that we're looking at, and

3  that's firearms.  And again, Detective Finley indicated

4  based upon his training, knowledge, and experience,

5  individuals like Mr. Knox more often than not are going

6  to have guns when they have this type of a history,

7  which is what Ms. McBee described.

8          But the good-faith inquiry is separate from

9  that.  The good-faith inquiry is whether Detective

10  Finley or another officer would have reasonably

11  concluded that despite the search warrant, the search

12  warrant was illegal.  And what Detective Finley did was

13  he went to a prosecuting attorney who's trained in the

14  law, who drew up this application and search warrant,

15  who obviously - based upon the fact that she included

16  the firearms - concluded that there must be probable

17  cause to search at this location.  And then it gets

18  taken to a judge and the judge signs that.

19          And so Detective Finley is put in the

20  position of having not just the judge, but the

21  prosecuting attorney review this and conclude that there

22  was a sufficient basis to search 431 Freeman for this--

23  for firearms.  And so that's what he was relying upon.

24  Whether the search warrant was devoid because it didn't

25  connect a gun to that address, that has to do with

1    probable cause, not the good-faith exception under *Leon*.

2    And I think she's trying to-- to tie both of those

3    together, and that's clearly not what *Leon* stands for.

4    And they're-- they're two separate inquiries.

5           And Detective Finley-- there was information

6    in there about the firearm, about Mr. Knox always having

7    a firearm and that Mr. Knox was at 431 Freeman.  So a

8    reasonably trained officer, again, based upon what

9    transpired here, would conclude that he had a lawful

10   basis to go to 431 Freeman and search not only for Mr.

11   Knox but for a firearm.

12          THE COURT:  All right.  I'll let you have

13   the last word, Ms. Ramsey.

14          MS. RAMSEY:  Thank you, Your Honor.  The

15   Court has stated the argument correctly, but the

16   disagreement is, is that that is what *Leon* says.  That

17   it is still necessary that for the good-faith exception

18   to apply, that the facts and circumstances ascribed in

19   the affidavit warrant a man to believe that such

20   evidence is located at the premises or location to be

21   searched.  That is the standard.

22          They are still required-- although they are

23   not held to be obviously attorneys or judges, they are

24   still held to a standard of being reasonable law--

25   well-trained law enforcement officers, which we would

```
 1   agree Detective Finley with his experience was.  And a
 2   finding of objective good faith based on that is
 3   inappropriate where that is not the case.  Because you
 4   get actions like this, you open up the world to there
 5   being such a flimsy idea of probable cause, that it
 6   cannot exist under the Fourth Amendment, that it has no
 7   purpose.  And that is-- that is the exact behavior in
 8   which it is designed to-- that it is not supposed to
 9   sanction.
10               THE COURT:  How does-- how does this factor
11   into your argument both on lack of PC and lack of good
12   faith?  There's corroboration arguably in this-- in this
13   affidavit as to the location of Mr. Knox.  There's--
14   there's the cell phone, there's the cell phone pings,
15   there is Ms. McBee's statement that-- that one of his
16   associates is Alecia Young, and it turns out that that's
17   her apartment or where she's staying.
18               But that there's no corroboration of Ms.
19   McBee's specific statements that he always carries guns
20   or that he carries guns of this particular type.  She
21   speaks of a protection order.  She speaks of other third
22   parties having been threatened, but there's - at least
23   not on the-- in the affidavit itself - any investigative
24   corroboration that, in fact, there are other people out
25   there that presumably can say that Mr. Knox threatened
```

1    them with a gun.

2         How does that factor into your argument,

3    first, that there's no probable cause with respect to

4    the gun itself and, secondly, that there's no good faith

5    under the *Leon* standard?

6         MS. RAMSEY:  Well, I think, Your Honor, in--

7    clearly in that there's-- there's no probable cause,

8    because still, again, you have no nexus.  And I-- and I

9    still believe that the information is clearly stale.

10   There's no clear indication-- Ms. Morehead qualifies--

11   uses the term "qualifying" word as "always," and which

12   "always" is actually not a qualifying word.  It means

13   everything.  So I think that clearly undermines any

14   reason to believe that that statement has-- would have

15   probable cause.

16        But I think what you've heard through

17   Detective Finley's testimony was that there were things

18   that could have been done for further corroboration.

19   Clearly, if there was a protective order, there could've

20   been investigation into that and more information given

21   to the judge.  Clearly, there was surveillance done or

22   more surveillance could've been done.  Clearly, there

23   were further witnesses if Ms.-- to follow up on Ms.

24   McBee's statement that could've been done.  But none of

25   that was done because it was not in good faith.

1          This statement was simply placed in there

2    under the guise that it would create-- in some sense to

3    me, inflame what they wanted, which was

4    this-is-a-bad-guy warrant.  But that's not enough.  And

5    so that information is in there, but it was

6    uncorroborated information.  I don't-- you could be

7    specific in saying that Your Honor has-- that you can

8    give specific information describing an event.  However,

9    it doesn't necessarily mean that event to be true.  And

10   they did not do any further investigation to corroborate

11   her information or the veracity of the information they

12   received from her.  That itself is lacking good faith.

13          THE COURT:  All right.  I'll take this under

14   advisement and issue a written decision.  Is this case--

15   this case is set for trial, as we said, on January 12.

16   But in the meantime, we're going to have another

17   hearing, so we're not going to be ready to go to trial

18   on January 12 anyway.  So we will see you back on

19   January 6th.  Is that when it is, Bonnie, or 7th?

20          COURTROOM DEPUTY:  7th.

21          THE COURT:  January 7th.

22          MS. MOREHEAD:  Does it say what time?

23          COURTROOM DEPUTY:  Let me look here real

24   quick.

25          MS. MOREHEAD:  And then just so I'm clear,

1    the January 12th date, is that off for certain, Judge?

2              THE COURT:  It's off the table.  We're going

3    to come up with a new trial date, yes.

4              MS. RAMSEY:  Thank you, Judge.

5              COURTROOM DEPUTY:  And it would be at 9:00.

6              THE COURT:  So January 7th at 9:00.  No

7    trial on January 12th.  We'll have to continue it to a

8    later date.

9              MS. RAMSEY:  Thank you, Your Honor.

10             THE COURT:  All right.  Thank you.  We'll be

11   in recess.

12                  (2:29 p.m. hearing recessed).

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4      I, Kelli Stewart, a Certified Shorthand Reporter and

 5   the regularly appointed, qualified and acting official

 6   reporter of the United States District Court for the

 7   District of Kansas, do hereby certify that as such

 8   official reporter, I was present at and reported in

 9   machine shorthand the above and foregoing proceedings.

10      I further certify that the foregoing transcript,

11   consisting of 46 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14      SIGNED June 7, 2016.

15

16

17

18           /s/ Kelli Stewart
                                              _____

19              Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25
```